ment in the construction involved, and that any taking of property was for the use and benefit of the Canadian government, if such suits are permitted by the Canadian government, and, if not, representations and claims should be presented through authorized channels of the executive departments of the two governments. In any event the United States is in the position of a third party. There was no contract, express or implied, between plaintiffs and defendant, and even if the allegations of the petition are taken in their most favorable light there is no taking by the defendant of the property of citizens of the United States for public use.

The petition fails to state a claim upon which relief may be granted by this court. Defendant's special defense is sustained and the petition, as amended, is dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

**STUDEBAKER–PACKARD CORPORATION, a Michigan Corporation,**

v.

**The UNITED STATES.**

No. 432–54.

United States Court of Claims.

Nov. 7, 1956.

Henry I. Armstrong, Jr., Detroit, Mich., for plaintiff. Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., were on the briefs.

J. W. Hussey, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Andrew D. Sharpe, Washington, D. C., and W. D. Kerr, Atlanta, Ga., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The plaintiff sues to recover alleged overpayments of excess profits taxes for the year 1942. These overpayments are claimed to have been caused by the refusal of the Commissioner of Internal Revenue to allow plaintiff to include in its invested capital advances made to it by Great Britain for the

purchase of tools, machinery and equipment. The inclusion of these advances would have increased plaintiff's excess profits credit for the years 1940 and 1941, which could have been carried over to 1942, since they did not need to be used in 1940 and 1941, thus decreasing the excess profits tax for 1942.

During 1940 and 1941 the plaintiff, then the Packard Motor Company, had a contract with Great Britain for the manufacture of airplane engines. Under the contract Great Britain was to furnish the tools, machinery and equipment for the manufacture of the engines, and plaintiff was to produce the engines with the tools, machinery, and equipment so supplied, together with its own tools, machinery and equipment.

The contract provided that the tools, machinery, and equipment should be at all times the property of Great Britain and might be removed by her at the termination of the contract. It was contemplated, however, that plaintiff, as the agent of Great Britain, would purchase the necessary equipment and machinery, and Great Britain was obligated to deposit $13,333,333 in the National City Bank of New York for this purpose. It was also obligated to deposit $6,666,667 in the Bankers Trust Company, to purchase tools.

With these tools, machinery and equipment, plaintiff was obligated to produce a certain number of engines for a fixed fee per engine. To assist it in defraying the cost of doing so, Great Britain agreed to pay to it $19,000,000, which plaintiff was required to deposit in the National Bank of Detroit and on which it might check as needed. On the 25th of each month during the life of the contract Great Britain was required to replace the amounts withdrawn in the previous month. On termination of the contract, any balance remaining in this account, after payment of all allowable charges, including the fixed fee of $1,200 per engine, was to be returned to Great Britain.

The plaintiff claims that these advance payments, both for cost of production of the engines and for the acquisition of tools, machinery, and equipment, were "borrowed invested capital" within the meaning of section 719(a) (2) of the Internal Revenue Code of 1939, which was added to that code by section 201 of the Second Revenue Act of 1940, 54 Stat. 975, 984, which was in turn amended by section 205(e) of the Revenue Act of 1942, 56 Stat. 798, 902. 26 U.S.C.A. Excess Profits Taxes, § 719(a) (2). The cited section says:

"*Borrowed capital.* The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus,

"(2) In the case of a taxpayer having a contract (made before the expiration of 30 days after the date of the enactment of the Second Revenue Act of 1940) with a foreign government to furnish articles, materials, or supplies to such foreign government, if such contract provides for advance payment and for repayment by the vendor of any part of such advance payment upon cancellation of the contract by such foreign government, the amount which would be required to be so repaid if cancellation occurred at the beginning of such day, but no amount shall be considered as borrowed capital under this paragraph which has been includible in gross income, plus,
* * *."

(26 U.S.C. (1940 Ed.) Supp. III, sec. 719(a) (1) and (2).)

The plaintiff says that its contract fulfilled the specifications of the statute, and that it should have been given an excess profits tax credit based on these advance payments as borrowed invested capital. The Government did so treat the $19,-

000,000 advance payment made to cover engine costs, except for the $1,200,000 which the plaintiff was to keep in any event. It refused, however, to so treat the other advance payments made on account of machinery and equipment costs. For that reason the plaintiff did not get the credit on account of borrowed invested capital which, it says, it was entitled to in 1940 and 1941, and hence did not have that credit to carry over and use in 1942.

The nature of the obligations assumed by the plaintiff answers the question of its right to include the money advanced for machinery, tools and equipment in *its* invested capital. Plaintiff's primary, indeed its sole, obligation was to produce the Rolls-Royce engines with the tools and equipment to be supplied by Great Britain. To perform its contract to produce the engines, with these tools and equipment, it would have been necessary, presumably, for plaintiff to borrow money. To save it from the necessity of doing so, Great Britain agreed to advance it money. Had plaintiff borrowed the money, it would have been entitled to include it in its invested capital, because it was necessary for plaintiff to have this capital in order to perform its contract. It was a part of the capital it had to invest in order to realize income from its contract.

But not so as to the machinery, tools and equipment. These were to be supplied by Great Britain, not by plaintiff. It was not necessary for plaintiff to put up any money on this account. Plaintiff did purchase these things as the agent of Great Britain, with the money supplied by her, but this was not done by plaintiff to discharge its contractual obligation. Whatever money was supplied for this purpose by Great Britain was supplied to discharge its contractual obligation, and not the obligation of plaintiff.

Since the money supplied was not to enable plaintiff to fulfill its obligations under the contract, it cannot be said that plaintiff had this money invested. It was Great Britain who had the money invested. Plaintiff expended the money, not to fulfill its contractual obligations, but as the agent of Great Britain. The machinery, tools, and equipment never belonged to plaintiff and, therefore, were not a part of its invested capital. The contract expressly recited that at all times they were the property of Great Britain.

We are of opinion that the Commissioner of Internal Revenue correctly computed the tax, and that plaintiff is not entitled to recover. Its petition will be dismissed.

It is so ordered.

JONES, Chief Judge and LARAMORE, Judge, concur.

MADDEN, Judge (dissenting).

I would allow the plaintiff to recover. The things which the plaintiff was to spend Britain's money for out of the machinery and facilities fund, and out of the equipment fund, were "articles, materials or supplies" within the meaning of the statute. Britain needed airplane engines, but in order to get them she had to have buildings and tools for their construction. These buildings and tools, provided with her money, were to belong to her, and the plaintiff's contract required it to build or acquire them for her.

The reason for the enactment of section 719(a) (2) is not very clear. Before the United States entered the war, or enacted an excess profits tax, foreign governments, particularly Great Britain, made contracts with American manufacturers for the manufacture of munitions. Most of these were cost-plus contracts, and if the manufacturers had had to borrow money to finance the contracts, it would have added that much to the costs. The advances thus saved the foreign government money, if it had the funds to advance.

When the excess profits tax was enacted, it provided that borrowed money, evidenced by certain formal instruments could be included in invested capital and thus reduce excess profits tax. Perhaps

in order not to put manufacturers who had advances from foreign governments but did not have the formal instruments of indebtedness required by section 719 (a) (1) at a disadvantage, Congress provided that in the case of contracts entered into before or within 30 days after the enactment of the excess profits tax law, advances from foreign governments could be treated as borrowed invested capital for excess profits tax credit purposes.

It seems to me that the suggested reason for the enactment of the law is just as applicable to the advance payments for the machinery and equipment, as for the engines themselves. If Britain had not advanced the money, the plaintiff could have borrowed it, perhaps would have had to borrow it, and charge it as a cost. If it had done so, it would have qualified under 719(a) (1) for an excess profits tax credit.

The Government urges that the machinery and equipment funds were different from the engine advance payments in that they were trust funds while the engine payments became debts of the plaintiff. All of the advances were deposited to the credit of the plaintiff and the plaintiff had the physical power to withdraw them from the banks. But whether it was expressly provided in the contract or not, it would have been a gross breach of the plaintiff's implied obligation for it to withdraw money from the engine fund for any other purpose than to pay the costs of manufacturing engines, or to pay itself fees that it had earned by manufacturing them. I do not think that Congress had in mind any delicate distinction between debts and trusts when it enacted section 719(a) (2). I have grave doubts that the engine fund was "at the risk of the plaintiff's business" as the Government expresses it. I doubt that it could have been reached by the plaintiff's creditors. In brief, I think all three of the funds were, to a substantially equal degree, held for a special and limited purpose, and should be similarly treated for tax

purposes. See West Construction Co. v Commissioner, 7 T.C. 974, for interesting comment on the statute.

LITTLETON, Judge, joins in the foregoing dissenting opinion.

**ERIE BASIN METAL PRODUCTS, Inc.**
v.
**The UNITED STATES.**
No. 50271.

United States Court of Claims.
Nov. 7, 1956.

